GETTY OIL COMPANY, a Delaware
Corporation, et al., Defendants
below, Appellants,

v.

Caroline M. HEIM, widow of Edward F.
Heim, et al., Plaintiffs below, Appellees.

GETTY OIL COMPANY, a Delaware
Corporation, et al., Defendants
below, Appellants,

v.

Carol STANLEY, Executrix of the Estate
of William L. Heal, Plaintiff
below, Appellee.

Supreme Court of Delaware.

Submitted Dec. 17, 1976.

Decided Feb. 24, 1977.

Rehearing Denied March 31, 1977.

William F. Taylor and Ben T. Castle of Young, Conaway, Stargatt & Taylor, Wilmington, for Getty Oil Co.

Harvey B. Rubenstein, Wilmington, for Caroline M. Heim.

Victor F. Battaglia and Gary W. Aber of Biggs & Battaglia, Wilmington, for Carol Stanley.

William J. Alsentzer, Jr. of Bayard, Brill & Handelman, Wilmington, for Koppers Co., Inc.

Before DUFFY and McNEILLY, JJ., and MARVEL, Chancellor.

DUFFY, Justice:

This appeal involves survival and wrongful death actions arising from a fire at the Delaware City Refinery of Getty Oil Company. In the Superior Court three plaintiffs asserted various claims against Getty and/or Koppers Company, Inc., and/or Catalytic, Inc.; one plaintiff (Rose T. Walker) and two defendants (Koppers and Catalytic) are not parties to the appeal.

Several motions for summary judgment were submitted to the Superior Court, which made the following rulings in its opinion and order dated August 16, 1976:

> "To summarize, *defendant's* (Koppers Company, Inc.) *motion for summary judgment is denied.* With respect to *plaintiffs'* (Carol Stanley, Executrix of the Estate of William J. Heal, and Caroline M. Heim, Widow of Edward F. Heim, et al.) *motion against Getty for partial summary judgment, the Court finds Getty negligent as matter of law and thus grants said motion* for summary judgment against Getty. However, Getty

may still present arguments regarding degree of fault and assumption of the risk in an effort to limit or avoid liability." (Emphasis in the original.)

Appeals and cross-appeals were filed and we have considered them on an accelerated basis because a lengthy trial is scheduled in the Superior Court at the March Term.

Upon consideration of the briefs and the contentions of counsel made at oral argument, we have reached the following conclusions on the issues submitted:

█ (1) *Strict liability* : The Trial Court found that it "should have more factual guidance than is present in this record" before determining this issue. Clearly, that ruling determined neither a substantial issue nor did it establish a legal right and, therefore, it is not appealable under settled law. *Pepsico, Inc. v. Pepsi-Cola Bottling Co. of Asbury Park*, Del.Supr., 261 A.2d 520 (1969).

(2) *Statutory negligence under 16 Del.C. § 6611* :[1] The Trial Court stated that:

"The purpose of this statute, as clearly expressed, is to protect people and property from harm caused by fire or explosions. The injuries to decedents in this case would have been avoided had Getty maintained its equipment (i. e. its oily

water sewer system) so that a large cloud of gas did not escape from it on November 8, 1971. Getty's Zone 1 superintendent, Baston, stated that the build-up of gas vapor in the sewer was caused by an unsafe act of a Getty foreman. Even without such an admission, the pressure [sic] of such a dangerous amount of gas in the air and the resultant explosion makes such a conclusion axiomatic."

Getty argues that the statute is vague and overbroad, and that in applying it the Superior Court did not announce any standards by which liability is to be measured or tested. For present purposes, we agree with that contention but it is not helpful to Getty. We say this because the undisputed material facts before the Trial Court establish that Getty was negligent.

█ For purposes of this appeal it is unnecessary to formulate specific criteria under § 6611. In our view, the Act can be regarded (without prejudice to Getty) as codifying the prudent-man rule, which is to say that Getty was obliged to conduct its refinery in a reasonably careful way. William E. Baston's report and testimony, which are not contradicted, show that the discharge of gasoline into the sewer system was an "unsafe act,"[2] inconsistent with Getty's "standard operating procedures,"[3]

---

1. 16 *Del.C.* § 6611(a) provides:

   "No person shall erect, construct, reconstruct, alter, maintain or use any building, structure or equipment or use any land in such a way to endanger life or property from the hazards of fire or explosion or in violation of any regulation or any provision of or any change thereof promulgated by the State Fire Prevention Commission under the authority of this chapter."

2. In his deposition of April 4, 1974, Zone 1 Superintendent Baston testified as follows:

   "Q. Was there any urgency in getting this vessel repaired?
   A. There's never an urgency for an unsafe act.
   Q. Was there any idea—
   A. There's always a goal to get equipment into operation as quickly as possible. There's no urgency to do an unsafe act. [at 67]

   . . . . .

   Q. In this particular instance, then, given those conditions, you would not describe it as

   a safe act, would you, to pump the gasoline into the oily water sewer sources?
   A. At the time it wouldn't be a safe act to do. But the man at the time, he's there at the time, he sees what conditions he's got, it's a matter of judgment on his part of whether he was doing a safe or unsafe act.
   I would say that if knowingly he thought he was doing an unsafe act—I don't think that he knowingly would have done an unsafe act if he thought it was unsafe.
   He thought what he was doing was safe.
   Q. If you were there at the time I believe you said you would have specifically instructed him not to pump the gasoline into the oily water sewer system, is that correct?
   A. Yes, I believe so. [at 76]"

3. Baston explained that the gasoline was injected into the oily water sewer to allow mechanics to repair the exchanger. Two other alternatives were available: First, the gas could have been pumped to the weathering drum, which was the normal procedure; second, the weathering drum could have been bypassed and the

creating an "unusual" condition in the refinery.[4] The discharge of the large amount of cooling water into the sewer system,

under the then prevailing conditions, compounded this "carelessness" and resulted in discharge of the explosive vapor.[5] The re-

gas could have been pumped to the off-test tank. For various technical reasons these alternatives were rejected. When asked about the propriety of pumping the gas into the sewer Baston testified:

"Q. Do you have any reason to think that was an incorrect decision?
A. To not pump it to the off-test tank?
Q. Yes.
A. No. I wouldn't say that was an incorrect decision. So he decided to pump it to the oily water sewer.
Q. Are you saying that you think that was a correct decision?
A. To pump it to the oily water sewer?
Q. Yes.
A. No.
Q. Where should it have been pumped?
A. He shouldn't have done anything.
Q. Just left it where it was?
A. Right. So he could safely pump it to the weathering drum. [at 65, 66]"

He subsequently testified:

"  .  .  .

Q I believe you said that in your judgment, given the circumstances that existed at the time that Mr. Grosclose made the decision, it was an unsafe act?
A It's not standard procedure to drain to the oily water sewer. [at 74]

.  .  ."

Finally, in the official fire report prepared by *Baston and Hunt, it is recommended that Getty* "[r]e-emphasize . . . [its] standard operating practice that prohibits the draining of large volumes of hydrocarbons to the oily water sewer . . .." Report of Fire, Monday, November 8, 1971, recommendation no. 2.

4. In addition, Baston testified as follows:

"  .  .  .

Q With reference to the amount of flammable vapors coming from the oily water sewer, that was not a common occurrence, was it?
A No.
Q Was the condition that existed on the afternoon and early evening of November 8th the kind of condition that you might find in the Getty refinery once in a month, or once in a year?
A No. Gases coming from oily water sewers is unusual—it's not a common practice, it's not a standard procedure. If there's gas that comes from the sewer, it's something abnormal.
Q Was the condition that existed that afternoon a condition which had existed at any time in the previous six months?
A No, not to my knowledge.
Q How about the previous year?
A Not to my knowledge. [at 60]

.  .  ."

In answer to Heim Interrogatory No. 79, Getty stated in part:
" . . . The purpose of the oily water sewer system is to collect such oily water and by use of an API Separator, remove the oil from the water before the water enters the river. However, on the date of November 8, 1971 there was some unusual draining of liquid through the oily water system as follows:
1. Gasoline from 22 E 104 A & B was drained into the sewer system during the afternoon of November 8, between the hours of 12:00 noon and 2:30 p. m. for 1½ to 2 hours.
2. Hot condensate and cooling water was also draining from the 40 pound Steam Flash Drum 22 D 115. It was also assumed that a larger volume of cooling water entered the sewer system from Quench Drum 22 D 15 immediately prior to the fire."

5. Baston explained the discharge of the water into the sewer system in this way:

"Q I believe you previously stated that the gasoline in the oily water sewer system created a problem of vapors which were coming through the manheads into the area, is that correct?
A That's what was reported.
Q Now, shortly before the fire your report indicates that there was a large volume of water that went into the oily water sewer system.
A We said there was a possibility, I believe.
Q A possibility of what?
A Of a large [sic] of water going into the oily water sewer.
Q At page 25 of your report, the second paragraph, Mr. Baston, didn't you there say that, 'Just prior to the fire which occurred at 5:42 P.M. a large volume of liquid, probably water, from 22–D–15 went into the oily water sewer system'?
A Let me read the whole thing. I don't want to take pieces out of it. (Reading.) From this we concluded that there had to be something to drive the gases out of this sewer. There had to be some means of causing the sewer to be pressured.
The only conclusion that we could come to was—the only large volume of water that we could see getting onto the oily water sewer would be out of D–15. That was the only large sudden source of water that could cut into the sewer.
Q So the conclusion of your report was that everything pointed to a large volume of liquid, probably water, from 22D–15 was passing into the oily water sewer system?
A That's right. [at 98–99]

.  .  ."

sult, surely, was negligence on Getty's part *vis-a-vis* these plaintiffs.

Thus, whether Getty's conduct is tested by common law negligence standards or under a similar standard for § 6611, the result is the same: Getty was negligent.

(3) *Proximate cause:* The Superior Court did not discuss proximate cause but since it determined that the liability claim against Getty should go to the jury, it necessarily concluded that plaintiffs were not entitled to a ruling of law in their favor on the causation issue. We reach a different conclusion.

■ It is undisputed that a cloud of gas was ignited and exploded. There is a dispute as to the source of and responsibility for the ignition, but this is not before us. The only reasonable conclusion from what is before us is that the explosion took place almost instantly with the appearance of the cloud and that the explosion caused the deaths. In short, Getty's negligence provided the fuel for the explosion.[6] Under these circumstances the only reasonable conclusion is that Getty's negligence, already established, was a proximate cause of the deaths. We so hold. But we make no judgment about fault on Koppers' part or any degree of fault as between Getty and Koppers.

(4) *Assumption of risk:* The Court ruled, without discussion, that Getty may present arguments, (presumably before the jury), regarding assumption of risk by the decedents. In our view, the uncontested evidence establishes that they did not assume the risk which is in issue. The governing law was stated by this Court in *Robinson v. Meding,* Del.Supr., 2 Storey 578, 163 A.2d 272, 276 (1960), as follows:

" . . . [One] does not assume a risk which cannot be reasonably anticipated and which may be the result of the negligent act of another. . . . Usually this doctrine is not applicable unless there was knowledge, express or implied, of the existence of the risk with a corresponding appreciation of the extent of the danger. . . . With such knowledge of the circumstances, plaintiff must have voluntarily exposed himself to the danger."

■ Defendants may have assumed the risks incident to work at an oil refinery, where fires appear to be a common occurrence; but that is not this case. It was the negligent act of Getty which produced the "gas cloud" which was ignited and resulted in the deaths. There is nothing in the record which tends to show that decedents reasonably anticipated that risk or, indeed, that they assumed the risk of any negligence associated with it.[7] *Robinson v. Med-*

6. Getty's own report (No. 71–43) of the fire, dated December 8, 1971, states in part:
"  . . . As to the origin of vapors, they emitted from the oily water sewer system in at least three locations. 1. The monitor boxes immediately south of the precipitator; 2. A manhole east of the compressor house; 3. The oily water sewer at pump stub ups.
. . .
10. Was the basic cause an unsafe act and/or an unsafe condition? Unsafe condition.
11. Describe specifically the unsafe act and/or condition. Vapors being released to atmosphere.
12. How do you account for the unsafe act and/or condition? Light ends pressuring up sewer system."
To this, Baston added:
"  . . .
Q I take it from your report that after the water went into the oily water sewer system, that then displaced these hydrocarbons in the

sewer and as a result the hydrocarbons were emitted from the manhole lids as a large vapor cloud?
A That's right.
Q Of course, that constitutes a dangerous condition because any source of ignition that's available in the area would then ignite that vapor cloud?
A True. [at 100]  . . . "

7. The record reflects that the explosion and fire were so sudden that the plaintiffs could not have voluntarily assumed the risk of it. For example, Baston testified:
"  . . .
Q Okay, less than five minutes before the fire. And an experienced refinery worker would have considered that there was no more than the normal amount of the normal amount of danger in working in that area?
A I would say so, yes. I would say, an experienced man, with the caliber of men we

*ing,* supra. We hold that on the basis of the undisputed facts in the record and what was before the Trial Court on the motions for summary judgment, decedents did not assume the risk of Getty's negligence which caused the gas cloud.

Reversed and remanded for proceedings consistent herewith.

## ON MOTIONS FOR REARGUMENT

Getty has moved for reargument, contending that there is a genuine issue of material fact on the assumption of risk issue and, for that reason, summary judgment should not have been granted as to that defense. Koppers makes the same argument and, additionally, seeks clarification as to whether the defense is available to it at trial. We consider the motions *seriatim.*

### I

To support its contention that a genuine issue of material fact remains to be resolved, Getty tenders the deposition testimony of Kenneth Caudill, a Getty employee who was a witness to the fire. His deposition was taken on January 17, 1977, one month after the case was submitted to this Court and nearly six months after submission to the Superior Court.[1] Obviously, that testimony was not considered by the Superior Court and no effort was made to make it available to this Court before our ruling was announced on February 24.

■ As a matter of general practice this Court refuses to consider evidence which was not part of the record below. On appeal, our function is to review the record, not to provide a forum for making

it. However, the circumstances here are exceptional and, given the age of the case, the imminence of trial and the significance of our ruling on the trial, we will measure the impact of Caudill's testimony against the soundness of our conclusion on the assumption of risk issue.[2]

■ We have closely examined those parts of Caudill's testimony submitted with Getty's motion for reargument and we conclude that it is inadequate for the purpose argued by Getty. While Caudill testified that, "on his own," he told "[p]eople . . to leave the area," he could not identify any of the decedents; the generality of his testimony does not create an issue as to whether there was knowledge of the particular risk by any decedent, an appreciation of the extent of the danger and a voluntary exposure to it. *Robinson v. Meding, supra.* See representative portions of Caudill's testimony in the Appendix. Substantively, it adds little to the record. Therefore, viewing Caudill's testimony in a light most favorable to Getty, as we must on a motion for summary judgment, *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver Inc.,* Del.Super., 312 A.2d 322, 325 (1973), we remain convinced that there is not a genuine issue as to a material fact and that the uncontroverted evidence demonstrates that the "decedents did not assume the risk of Getty's negligence which caused the gas cloud." Accordingly, Getty's notion for reargument will be denied.

### II

■ Koppers, the manufacturer of the electrostatic precipitator which is alleged to

---

had out there, and Tommy was one of the best, and this John Holsten who was working with him was one of our better operators, they would have recognized the danger and gotten the people out of there.

They wouldn't have stayed in a dangerous area themselves without taking certain precautions to ensure their safety.

That's what led us to conclude that it had to be a *sudden* eruption of gas for that size *volume* of fire. Just gas that had been previously reported as leaking wouldn't have resulted in the type of fire that they had. [at 165]

. . . "

1. Under the order entered by the Superior Court, the litigants were free to continue discovery on the assumption of risk issue but the Court's ruling, of course, was based on the record at the time of decision.

2. The deaths occurred almost six years ago and the longer final disposition is delayed the more difficult it becomes to do justice for all the parties. The case is scheduled for trial in the Superior Court during the March Term.

have provided the spark that ignited the fumes, is a party to the actions in Superior Court but is not a party to the appeal. It is also a defendant in a separate action for wrongful death, brought by Rose T. Walker, which was consolidated by the Superior Court for trial with the *Heim* and *Stanley* suits but which was severed by this Court for appeal purposes. For that reason, nothing said in the opinion is intended to bind Koppers as a party (as Getty is bound). In short, the mandate will not be directed to Koppers. But we make no judgment as to whether our ruling has or has not any precedential effect on Koppers, based on other principles of law. That is a matter for consideration by the Trial Court in the first instance. Koppers' motion for reargument, therefore, will be denied.

## APPENDIX

Testimony of Kenneth Caudill:

"BY MR. SEMPLE:

Q I'm Mr. Semple. I represent Catalytic. You indicated earlier that all those people who were not searching for the leak were told to evacuate the area, correct?

A You say all? All to my knowledge that I had seen were told.

Q Well, who initiated the idea of evacuating the area?

A I don't know.

Q Well, did someone direct you?

A No.

Q But you did in fact tell people to evacuate the area?

A Yes.

Q You did that on your own?

A Yes. [at 40–41]

.　　.　　.　　.　　.

BY MR. RUBENSTEIN:

Q What time of the day did you start evacuating people?

A I can't tell you what time it was.

Q Was it 3:00, 4:00?

A I don't know.

Q Who did you evacuate specifically?

A Pipefitters and millwrights.

Q You don't know what time of the day it was?

A No, I couldn't give you a specific time.

Q Did you tell them to leave the area?

A Yes. [at 48]

.　　.　　.　　.　　.

COUNSEL UNIDENTIFIED:

Q Who's Vernon Brown?

A He's a millwright.

Q Foreman?

A Right.

Q Did you recall giving instructions to Vernon Brown, the millwright foreman, to evacuate millwrights from the area?

A No.

Q You don't recall or you didn't?

A No, I didn't.

Q You did not?

A I did not. [at 49]

.　　.　　.　　.　　.

COUNSEL UNIDENTIFIED:

Q Well, let me go about it a little differently. In order to evacuate an area of workmen, who in the level of supervision makes that decision?

A Only his boss. His boss tells him to leave.

Q All right. Who at Getty would make a decision to evacuate an area in the Getty line of supervision?

A Supervision? Well, I imagine anybody. That's part of my job. That's part of my responsibility to tell them to leave.

Q So you're saying that you have the authority to request any workmen to leave an area if you think for any reason it's unsafe?

A I have the responsibility to tell the man to leave if it's not safe. Now, whether he listens to me or not, you know, is a different story.

Q  All right.  I take it that would include both Getty employees and Catalytic employees?

A  When you refer to Getty employees, anybody.

Q  Anybody?

A  If it was somebody that wasn't a regular operator of the unit, yes, I have and I will tell them to leave if it's not safe.

Q  All right.  Do you remember how many people you instructed to leave?

A  No.

Q  Do you feel that you did instruct people to leave on that afternoon?

A  I know I did.  [at 53–54]

.    .    .    .    .

COUNSEL UNIDENTIFIED:

Q  Well, my other question was you would only tell people to leave the area as you ran into them is that correct as you saw them, as you found them?

A  Yes.  Or how else could I tell them?

Q  Well, what I'm asking you is whether or not you made an effort to find out who was going to be assigned to work in that area in order to see to it that they did not report for work in that area?

A  Like I said before, it's not my job to assign people to jobs and know where they're working.  It's not my responsibility.

Q  That's not my question, Mr. Caudill. My question is that you felt people ought to be evacuated from the area;  is that correct?

A  Yes.

Q  As you ran into people you would tell them to leave the area;  is that correct?

A  Yes.  [at 56]"