DELAWARE ELECTRIC COOP-
ERATIVE, INC., Defendant
Below, Appellant,

v.

Darryl DUPHILY and Delaware Insur-
ance Guaranty Association, Plain-
tiffs Below, Appellees,

and

Simmons Communication Company and
Mid–Shore CATV, Inc., Cross-claim
Defendants Below, Appellees.

No. 521, 1996.

Supreme Court of Delaware.

Submitted: Sept. 16, 1997.
Decided: Nov. 20, 1997.
Rehearing Denied Dec. 12, 1997.

Roger A. Akin, Sawyer, Akin & Herron, P.A., Wilmington, for Appellant.

John S. Grady, Grady & Hampton, P.A., Dover, for Appellee Darryl Duphily.

James T. Perry, Wilmington, for Appellee Delaware Guaranty Insurance Association.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

WALSH, Justice.

In this appeal from the Superior Court, we consider whether a jury verdict finding an electric cooperative to be solely liable for injuries to an employee of a mobile home installation company is against the great weight of the evidence. We also consider whether the jury's award of damages was excessive. We conclude that, under the circumstances of this case, the jury's findings on proximate causation, specifically its rejection of an intervening or superseding cause, are not contrary to the great weight of the evidence. We further conclude that, in view of the catastrophic injuries received by the plaintiff, the jury's verdict is not excessive.

## I

The jury could reasonably have found the following facts. During the summer of 1990, the appellee/plaintiff-below, Darryl Duphily

("Duphily"), was employed by New Look Homes, Inc. ("New Look"), a company that sells and installs double-wide mobile homes ("double-wides"). Double-wides are prefabricated, single story houses that are transported in sections to a home site and erected as a single structure.

In June 1990, William Hamilton purchased a double-wide from New Look for placement on his lot at White House Beach, a mobile home park near Millsboro, Delaware. On August 7, 1990, New Look delivered his double-wide in two sections. To place the sections on the lot, the delivery truck had to back each section from an adjacent road, over a speed bump, across a strip of grass, and under a set of three parallel utility lines. The lines consisted of a phase wire charged with 7200 volts of electricity, a neutral line approximately eight feet below the phase wire, and a low voltage coaxial television cable approximately three feet below the neutral wire.[1] Delaware Electric Cooperative, Inc. ("DEC") owned and maintained the phase wire and the neutral line, the highest two utility lines. The television cable, the lowest line, was owned by Simmons Communication Company and Mid–Shore CATV, Inc. (collectively "Simmons").

Upon delivery, John Starke ("Starke"), the president of New Look, planned to back in one of the thirteen and one-half feet high sections while three employees gave him directions. When it appeared that the unit would snag on the neutral and television lines, Duphily, on his initiative but with his employer's knowledge and tacit approval, climbed atop the double-wide. With his bare hands, Duphily lifted the television cable and neutral wire to allow the double-wide to pass under these lines. Duphily, walking backwards along the edge of the roof holding the lower two lines in his bare hands, lost his balance when the truck passed over a speed bump. Instinctively, he dropped the lower lines and grabbed the uppermost 7200 volt phase wire. The electric shock he received caused permanent injury to his leg and the eventual amputation of his left forearm.

During a storm one month before the accident, a tree had fallen on the lines. DEC had sent a crew to repair the damage that night. By flashlight, the crew had resagged the wires but at a height apparently below industry standards.[2] The parties dispute which lines were repaired that evening. DEC contends that only the upper phase wire was resagged. Duphily asserts that all three lines were resagged by DEC.

Duphily originally filed a negligence action against Simmons and DEC for failing to keep the electrical and television lines at the minimum height required by the National Electric Safety Code ("NESC").[3] Duphily also sought recovery from White House Beach, Inc. ("White House"), the entity that operated the mobile home park. New Look could not be a joint tortfeasor under Delaware's workers' compensation law. 10 Del.C. §§ 6301–6308. Duphily's medical expenses were paid by New Look's workers' compensation insurance carrier, International Underwriter Insurance Company ("International"), and subsequently by Delaware Insurance Guaranty Association ("DIGA"), which had assumed the rights and obligations of International when it was placed in liquidation. DIGA intervened to assert its workers' compensation lien for the benefits it paid to Duphily. 19 Del.C. § 2363.[4]

The matter proceeded to trial in 1994. In the midst of this trial, Duphily settled with

---

1. The exact height of the lines above ground level was disputed at trial.

2. During installation, electrical lines are strung loosely to allow for expansion and contraction. The lines are strung to a predetermined catenary, known as "sag." The process of loosening a line to provide the correct catenary between poles is known as "sagging."

3. The NESC is the result of collaborative effort between the National Bureau of Standards, the United States Bureau of Commerce, and leading industry representatives. It provides basic guidelines for the electric industry and represents "the mature judgment and experience of professionals in the electric industry." *Alabama Power Co. v. McIntosh*, 219 Ala. 546, 122 So. 677, 680 (1929). *Accord Yampa Valley Elec. Assoc., Inc. v. Telecky*, Col.Supr., 862 P.2d 252, 254 n. 1 (1993).

4. The undisputed amount of DIGA's damages is $115,739.10. The parties stipulated to future prosthetic expenses of $77,815.

Simmons and White House. The jury found that DEC and New Look were negligent. Further, the jury determined that Duphily's injuries were proximately caused by DEC's negligence *and* that New Look's negligence was an intervening, superseding cause. Duphily appealed, and this Court reversed and ordered a new trial. *Duphily v. Delaware Elec. Coop., Inc.*, Del.Supr., 662 A.2d 821 (1995) (*"Duphily I"*). In *Duphily I*, we held that the jury's finding that DEC's negligence was a proximate cause of Duphily's injury presupposed the absence of a superseding cause and that the resulting verdict was facially contradictory. *Id.* at 833. The jury verdict was reversed, and the case remanded for retrial.

In the retrial, the second jury again found that DEC and New Look were negligent. It determined, however, that New Look's negligence was not a superseding cause. Instead, DEC's negligence was found to be the sole and proximate cause of the accident. The jury found that Duphily, Simmons, and White House were not negligent and awarded Duphily $3,000,000. DEC's post-trial motion for a new trial and/or remittitur was denied. *Duphily v. Delaware Elec. Coop., Inc.*, Del.Super., C.A. No. 91C–05–021 (Nov. 27, 1996) (OPINION and ORDER).

## II

On appeal, DEC claims that the Superior Court erred by: (i) denying DEC's motion for new trial because a verdict of sole liability is so contrary to the evidence that a reasonable jury could not have reached that result; (ii) failing to set aside the jury's verdict because, on the evidence presented, a rational jury could not have found both that New Look was negligent and that such negligence was not an intervening, superseding cause; and (iii) denying remittitur, in lieu of a new trial.

Before addressing the merits of the appeal, we must consider a procedural issue affecting the scope of our review. During briefing in this Court, Duphily moved to have portions of DEC's opening brief and appendix stricken on the ground that DEC had sought to include, and rely upon, matters outside the record. We are thus required to rule upon what constitutes the record on appeal, particularly in light of recent changes in discovery procedures in the trial courts. *See, e.g.*, Super.Ct.Civ.R. 5(d).

Duphily objected to the inclusion in DEC's appendix of the following items: (i) interrogatory answers not admitted into evidence at trial; (ii) Tortfeasor's Releases between Duphily, White House, Simmons, and DIGA, also not admitted into evidence; (iii) references to cash settlements Duphily received from White House and Simmons; (iv) a deposition exhibit that was not admitted into evidence at trial; (v) references to testimony in the first trial; and (vi) reference to a pretrial stipulation and order which was not admitted into evidence at trial.

DEC responds that the record on appeal has broader scope than Duphily suggests. DEC contends the record should include all materials necessary to ensure this Court is "fully apprised of the proceedings below, both before, during, and after trial...."

■ It is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by a trial court. Parties are not free to advance arguments for the first time on appeal. "Only questions fairly presented to the trial court may be presented for review...." Supr. Ct.R. 8.

■ Supreme Court Rule 9(a) implicitly imposes a limitation upon the record on appeal by requiring that such record shall consist of "the original papers or ·exhibits." "Original papers" are documents filed with and presented to the trial court. This classification does not include documents prepared solely for introduction into evidence. Examples of original papers include: pleadings; pretrial orders; process and proof of service of process; court orders; court memoranda; motions and supporting documents; clerk's minutes; docket entries; affidavits; proposed jury instructions; master's reports; proposed findings of fact and conclusions of law; opinions of the court; judgments; and notices of appeal. 20 James W. Moore et al., Moore's Federal Practice ¶ 310.10[1] (3d ed. 1997).

█ The record on appeal may also include transcripts from trials and related hearings. Supr.Ct.R. 9(b)–9(h). Documents and exhibits introduced into evidence at trial are a part of the record. Similarly, materials and exhibits offered, but not admitted, into evidence and usually marked only for identification are a part of the record on appeal for determination of their admissibility. Exhibits introduced into evidence, but later withdrawn, may be considered part of the record on appeal if they contributed to the trial court's decision. Materials not offered into evidence are not a part of the record, unless considered by the trial court and necessary to disposition on appeal.

█ The inclusion of discovery material in the trial record, once required, is now severely restricted. Accordingly, in civil matters, discovery materials are no longer filed with the trial courts. Super.Ct.Civ.R. 5(d); Ch. Ct.R. 5(d); Fam.Ct.Civ.R. 26(e); Com.P.Ct. Civ.R. 5(d) [5]. Thus, discovery material is not a part of the record in the trial court unless admitted into evidence or entered into the record through motion. A resulting corollary is that, if the discovery material does not find acceptance in the trial record, it forms no part of the record on appeal.

█ It is the ultimate responsibility of the parties to place relevant portions of the trial record in the record on appeal. Failure to comply with these provisions may result in *sua sponte* dismissal of the appeal or foreclose a party from argument on an issue that lacks record support. Supr.Ct.R. 9(f); Supr. Ct.R. 29(b); *Tricoche v. State*, Del.Supr., 525 A.2d 151 (1987). Accordingly, Duphily's motion to strike interrogatory answers offered by DEC but not introduced into evidence must be granted.

█ Turning to Duphily's motion to strike the Tortfeasor's Releases and all references to Duphily's cash settlements, DEC contends that several witnesses shifted emphasis in their testimony after settling with Duphily and that these materials are relevant to an assessment of their credibility. Any reference to a settlement is inadmissible during trial, however, under Delaware Rule of Evidence 408.[6] Had DEC sought to present these materials during trial, or post-trial in connection with its motion for a new trial, and had they been considered by the trial court, it could be argued that they are properly before this Court. In the absence of any indication that the settlement events were ever considered by the trial court, there is no authority for their consideration here. Thus, Duphily's motion to strike the Tortfeasor's Releases and the references to the settlements is granted.

█ Duphily has also moved to strike a deposition exhibit not admitted into evidence at trial. We note that the offered exhibit is similar to an admitted exhibit. In unusual circumstances, the parties may stipulate that additional exhibits be presented on appeal, if necessary to aid the appellate court's understanding of issues properly before it. *Getty Oil Co. v. Heim*, Del.Supr. 372 A.2d 529, 534 (1977). *See also* Supr.Ct.R. 9(g). We perceive no extraordinary circumstances that justify departure from the norm in this case, and we grant the motion with respect to the deposition exhibit.

█ As to Duphily's motion to strike all references to testimony in the first trial, when a new trial is ordered, the original trial is considered a nullity for purposes of a subsequent appeal. Therefore, the motion to strike references to the first trial is granted.

**5.** Rule 5 in the Superior Court, Court of Chancery, and Court of Common Pleas all have identical relevant provisions.

**6.** D.R.E. 408 provides:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount.
Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.

██ Finally, we address Duphily's motion to strike references to a pretrial stipulation and order. Duphily concedes that the pretrial stipulation is a part of the record but argues that it was not placed into evidence. As previously noted, to the extent the appellate record includes "original papers," it is broader in scope than the evidence presented to the fact finder. It includes stipulations that serve to amend pleadings and moot factual contentions. Pretrial stipulations, with implementation orders, fall in that category and are properly part of the record on appeal. Based on the foregoing, Duphily's motion to strike is granted with respect to the interrogatory answers, the deposition exhibit, the Tortfeasor's Releases, and references to cash settlements and testimony from the first trial. The motion is denied with respect to the pretrial stipulation and order.

### III

██ Turning to the merits of the appeal, the Court reviews DEC's appeal from the denial of its motion for a new trial and/or remittitur under an abuse of discretion standard. *Medical Ctr. of Del. v. Lougheed,* Del. Supr., 661 A.2d 1055 (1995).

### A.

We address first DEC's claim that the trial court erred by not granting its motion for a new trial because a verdict placing sole liability on it is so contrary to the weight of the evidence that a reasonable jury could not have reached that result. Specifically, DEC asserts that, if its liability was due to the low neutral wire, Simmons must be equally culpable since the television cable was the lowest of the three lines. DEC argues that this is a typical "low wire" case and that "[t]he record is uncontroverted that only one wire (the phase) was downed."[7] The record, however, indicates that two witnesses, a neighbor and the trailer park manager, testified that all lines were downed during the storm. Additional testimony also supports the inference that all three lines sagged lower after DEC repaired them.

██ In its instructions to the jury, the Superior Court differentiated between the duties of Simmons and DEC based upon the relative dangers posed by their respective cables. The jury was instructed that the "greater the risk of injury, the greater the duty of care" and that "Simmons has a duty to install and maintain its wires as would a reasonable careful and prudent cable company under the circumstances." Conversely, DEC's duty was characterized as follows: "considering the danger of contact with electric wires, the electric company has a high duty to safeguard the public from known potential injuries that would occur from contact with the electric wires." Because there was no objection to these instructions, we must conclude that DEC was content to have its duty *vis-a-vis* Simmons defined in this fashion. To a degree, the evidence was in conflict concerning Simmons' participation in the events leading to Duphily's injuries, but there was sufficient basis for a jury to find that DEC violated its duty of care and that Simmons did not.

In denying DEC's motion for a new trial, the Superior Court held that a reasonable juror could have concluded that DEC negligently repaired all three lines after the storm. The trial court held that the jury could rationally have viewed this as a negligent repair, not a "low wire," case. We agree.

DEC further argues that, even if DEC's employees negligently repaired the lines, Simmons had a duty to inspect and ensure that its television cable was within NESC standards. We interpret this argument as framing two distinct theories for finding Simmons liable—first, that Simmons must have been negligent because it knew, or should have known, that its cable television wire was too low and second, that Simmons was negligent *per se* by maintaining its cable in violation of the NESC. We find each theory to be without merit.

To support its claim of actual or constructive notice of the hazard, DEC asserts that a Simmons' repair technician made regular trips to the area in the month-long interval

---

**7.** Opening Brief of Appellant Delaware Electric     Cooperative, p. 23.

between the storm and the afternoon when Duphily was injured. Either the jury was not persuaded by this argument, or it concluded that Simmons' duty to repair depended on DEC's prior repair of the electrical wires because of the higher voltage. In either event, there is no basis for disturbing the jury's rejection of that claim.

On DEC's other theory of liability, it contends that, in permitting the television cable to sag in violation of NESC standards, Simmons' conduct amounted to negligence *per se.* DEC argues that the violation of a statute enacted for the safety of others is negligence *per se,* provided that there is a causal connection between the statutory violation and the alleged injury and that the injured party is a member of the class of persons the statute was intended to protect. *Duphily I,* 662 A.2d at 828; *Wright v. Moffitt,* Del.Supr., 437 A.2d 554, 557 (1981); *Sammons v. Ridgeway,* Del.Supr., 293 A.2d 547, 549 (1972).

■■ The premise for DEC's contention that Simmons has a statutory or regulatory duty is not supported by the record. It appears that Simmons' duty to adhere to NESC standards arises from a contract with DEC and not from regulations promulgated pursuant to legislative directive. *See Sammons,* 293 A.2d at 550.[8] Thus, Simmons' failure to adhere to NESC standards is some evidence of negligence, as the Superior Court properly instructed the jury, not negligence *per se.*

If it be assumed, *arguendo,* that Simmons was in technical violation of the NESC for mounting a sagging line, it is a reasonable interpretation of the evidence that all three lines were negligently repaired by DEC. Because the jury could rationally conclude that DEC's duty to maintain its 7200 volt electrical wires was greater than Simmons' duty to maintain its low voltage television cable, Simmons' theoretical negligence was simply of little or no consequence under the circumstances of this event.

### B.

With respect to DEC's second claimed error, DEC asserts that the trial court should have granted a new trial because no reasonable jury could have found that New Look's actions were negligent but were not an intervening, superseding cause. The crux of this argument is that, although DEC created the hazard, New Look's actions were so patently negligent that DEC should be relieved of liability for its negligent repairs.

■■ Delaware adheres to the traditional "but for" definition of proximate causation. *Duphily I,* 662 A.2d at 828; *Culver v. Bennett,* Del.Supr., 588 A.2d 1094 (1991). A proximate cause is one that "in natural and continuous sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred." *Culver,* 588 A.2d at 1097 (quoting *James v. Krause,* Del.Super., 75 A.2d 237, 241 (1950)) (emphasis supplied).

■■ In *Duphily I,* we defined "intervening" and "superseding" causes.

An intervening cause is one which comes into active operation in producing an injury *subsequent* to the negligence of the defendant. The mere occurrence of an intervening cause, however, does not automatically break the chain of causation stemming from the original tortious conduct.... In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor.

*Duphily I,* 662 A.2d at 829 (citations omitted) (emphasis in original). Thus, a third party's act is an intervening, superseding cause if it was either unforeseeable, or was foreseeable but conducted in an extraordinarily negligent manner. *Id.* at 830. A foreseeable event is one where the defendant should have recognized the risk under the circumstances. *Id.*

---

8. Cable television is regulated by the Delaware Public Service Commission, but it is not a "public utility." 26 *Del.C.* § 102(2)(4). Thus, to the extent that the Public Service Commission has adopted NESC standards in its regulation of public utilities, 26 *Del.C.* § 209(a), such regulation does not extend to cable systems, which are regulated separately under 26 *Del.C.* § 601, *et seq.*

DEC correctly asserts that a utility company is neither the insurer of the public nor responsible for the unprecedented acts of others. *Hercules Powder Co. v. DiSabatino,* Del.Supr., 188 A.2d 529, 534 (1963). It is also obvious that New Look's method of operation was highly questionable.[9] DEC cannot reasonably argue, however, that backing a mobile home into a mobile home park is unforeseeable.[10]

∎∎∎∎∎ The jury was presented with substantial evidence concerning the conduct of New Look and the danger it posed to Duphily. The jury's finding of causation, which implicitly rejected superseding liability, must be respected unless "there can be no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinarily negligent...." *Duphily I,* 662 A.2d at 831. Each case is to be decided in the light of its own facts. *DiSabatino,* 188 A.2d at 534. Thus, we conclude that sufficient evidence was adduced at trial to support the jury's finding that New Look's negligent actions were not an intervening, superseding cause of Duphily's injuries.

### C.

DEC's final claim of error is that the trial court abused its discretion by denying DEC's motion for remittitur. DEC argues that the damages award is "grossly out of proportion" to Duphily's injuries. DEC also contends that assertions made by Duphily's counsel in his closing argument, *i.e.,* DEC burned him once ... don't let them burn him again, were improper and inflamed the passions of the jury.

∎∎∎∎∎∎ This Court may remand for a new trial when the record reveals a "studied purpose on the part of counsel to inflame or prejudice the jury improperly." *McNally v.*

*Eckman,* Del.Supr., 466 A.2d 363, 375 (1983). Counsel may not mislead a jury or appeal to its bias or prejudice, and, "where objection is made," the trial court is obliged to cure the prejudice. *DeAngelis v. Harrison,* Del. Supr., 628 A.2d 77, 80 (1993).

∎∎∎∎ The lower court described the comportment of Duphily's counsel as "low-key" during the trial. *Duphily v. Delaware Elec. Coop. Inc.,* Del.Super., C.A. No. 91C–05–021, (Nov. 27, 1996) (Letter Op. at 2). In addition, the jury was instructed not to allow sympathy to influence their verdict. We are persuaded by the trial court's description of the comportment of plaintiff's counsel and agree that the precautionary instruction to the jury was sufficient.

∎∎∎∎ As for assertions made by Duphily's counsel during closing arguments, there was no contemporaneous objection, no post-summation objection and no request for a curative instruction. As we noted in *Lougheed.*

> [a] party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error.... The failure to object generally constitutes a waiver of the right subsequently to raise the issue [on appeal].

*Lougheed,* 661 A.2d at 1060. Thus, DEC waived the right to argue this issue on appeal.

∎∎∎∎ The award is substantial, but, as the trial court notes, Duphily's injuries were horrific and gruesome. Immediately after being electrocuted, Duphily caught fire but did not lose consciousness. Out of a fear of being electrocuted themselves, bystanders did not extinguish the fire immediately. As a result, Duphily suffered severe burns in addition to a guillotine-type amputation of his forearm. Duphily's hospitalization was extended, and his treatments exceedingly painful. In addi-

---

9. For example: New Look was aware of the low wires because they moved them with a stick ten days earlier while removing Hamilton's old trailer; New Look did not train Duphily in wire safety; Starke was uncertain which wires were hot; Duphily was not given any gloves; Starke was aware of the speed bump; Starke testified that he was under time pressure and a call to have DEC deactivate the lines would have delayed him; and Duphily was a 19 year old sum-

mer laborer and probably reluctant to object. Starke testified that, in retrospect, it was unsafe.

10. The jury was instructed: "it is not necessary for the power company to foresee that ... anybody would be standing on top of a mobile home.... [I]t's merely enough that injury from shock was foreseeable."

tion to his amputation, he suffers from a permanent limp. In view of his age at the time of injury (19) and the severe physical impairments he has sustained, the jury's award was understandable. In light of all the evidence, the verdict of $3,000,000 did not shock the conscience of the trial court, and we perceive no basis to disturb that ruling as an abuse of discretion.

For the reasons stated, appellee's motion to strike portions of the appellant's briefing materials is GRANTED IN PART AND DENIED IN PART. The judgment of the trial court denying appellant's motion for new trial and/or remittitur is AFFIRMED.