IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOEL GREEN,[1]                           §
                                         § No. 189, 2023
        Respondent Below,                §
        Appellant,                       § Court Below–Family Court
                                         § of the State of Delaware
        v.                               §
                                         § File Nos. 23-02-4TK
DEPARTMENT OF SERVICES                    §
FOR CHILDREN, YOUTH AND                   § Petition No. 23-03411
THEIR FAMILIES/DIVISION OF               §
FAMILY SERVICES,                         §
                                         §
        Petitioner Below,                §
        Appellee.                        §

Submitted:   November 3, 2023
Decided:     January 22, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## ORDER

After consideration of counsel's non-merit brief filed under Supreme Court Rule 26.1(c), her motion to withdraw, the appellee's response, the Children's Attorney's response, and the record on appeal, it appears to the Court that:

---

[1] The Court previously assigned a pseudonym to the appellant under Supreme Court Rule 7(d).

(1)     By order dated May 1, 2023, the Family Court terminated the parental rights of the appellant, Joel Green ("Father"), in his two children—G.G. (a boy, born in 2014) and A.G. (a girl, born in 2015) (together, the "Children").[2]  Father appeals.

(2)     On appeal, Father's counsel has filed an opening brief and motion to withdraw under Rule 26.1(c).  Counsel asserts that she has conducted a conscientious review of the record and the relevant law and has determined that Father's appeal is wholly without merit.  Counsel informed Father of the provisions of Rule 26.1(c), provided him with a copy of counsel's motion to withdraw and the accompanying brief, and advised him that he could submit in writing any additional points that he wished for the Court to consider.  Father did not respond to counsel's motion but later submitted argument directly to the Court.  The appellee, the Department of Services for Children, Youth and Their Families/Division of Family Services ("DSCYF"), and the Children's Attorney have responded to counsel's Rule 26.1(c) brief and argue that the Family Court's judgment should be affirmed.

(3)     In 2020, DSCYF opened a treatment case for Father and the Children's mother ("Mother") because of concerns about, among other things, their history of domestic violence and their substance-abuse and mental-health issues.  DSCYF approved a safety plan under which the Children would live with Mother and their

---

[2] The Family Court's order also terminated the parental rights of the Children's mother, who is not a party to this appeal.  We refer only to facts in the record that relate to Father's appeal.

maternal grandmother ("Maternal Grandmother"). At the time, Mother had a protection-from-abuse order against Father and there was an active no-contact order between Father and his father ("Paternal Grandfather"). After Maternal Grandmother informed DSCYF that she could no longer care for the Children because of her medical issues, Father, Mother, Maternal Grandmother, Paternal Grandfather, and the Children's maternal aunt convened for a team-decision-making meeting on November 12, 2021. The parties agreed that the Children and Mother would live with Paternal Grandfather and that Father would not have contact with Paternal Grandfather. DSCYF explained that it would petition for custody of the Children if the safety agreement was violated. On November 27, 2021, DSCYF made an unannounced visit to Paternal Grandfather's house and discovered Father hiding in a bedroom closet. DSCYF thereafter successfully petitioned for custody of the Children.

(4) With the filing of DSCYF's dependency-and-neglect petition, the mandated hearings followed.[3] Father, who had eight outstanding capiases, failed to appear at the preliminary protective hearing, and the Family Court found that the Children were dependent in his care. The court also found that DSCYF had made reasonable efforts to prevent the unnecessary removal of the Children from their

---

[3] When a child is removed from home by DSCYF and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. Civ. Pro. Rs. 212-219.

home, noting that Paternal Grandfather had failed to protect the Children from Father and that Maternal Grandmother was no longer a placement option. At the adjudicatory hearing, the Family Court found that the Children continued to be dependent in Father's care based on his outstanding legal issues. The Children were adjusting to their foster home. Both G.G. and A.G were diagnosed with and medicated for ADHD, and G.G. suffered from insomnia and gastrointestinal issues. The Family Court found that DSCYF had made reasonable efforts to prevent the unnecessary removal of the Children from their home.

(5) In February 2022, the Family Court held a dispositional hearing via Zoom to review the case plan that DSCYF had developed to facilitate Father's reunification with the Children. Father's case plan prioritized his mental-health and substance-abuse issues and required him to (i) undergo a mental-health evaluation and heed all follow-up recommendations; (ii) continue substance-abuse treatment, provide DSCYF with random urine screens, and sign a consent form to allow DSCYF to obtain information regarding his treatment; and (iii) undergo a domestic-violence assessment and follow all recommended treatment. The plan also called for Father to resolve his pending criminal charges and not acquire new ones, attend parenting classes, work with a family interventionist, and maintain (and show proof of) stable employment. Finally, because Father continued to live with Paternal

4

Grandfather in violation of the no-contact order, the case plan required Father to locate safe and appropriate housing. The Family Court approved Father's case plan.

(6) As of the May 4, 2022 review hearing, Father, who had been out of state for the dispositional hearing, had returned to Delaware in April and had re-engaged with DSCYF. He had been attending a substance-abuse treatment program for approximately one week and had submitted two dirty urine screens. Because Father had not been working with DSCYF until recently, he was still waiting on referrals for a mental-health evaluation and a family interventionist. Father had cleared his capiases and signed up for domestic violence classes. Father was no longer living with Paternal Grandfather but was homeless. At the conclusion of the hearing, the Family Court found that it was in the Children's best interests for them to remain in DSCYF custody.

(7) As of the June 28, 2022 six-month review hearing, Father had made minimal progress on his case plan. Although Father had completed a mental-health evaluation and signed up for domestic violence classes, he (i) had not spoken to his caseworker in one month; (ii) claimed to be receiving unemployment benefits, but had not provided proof to DSCYF; (iii) had not been compliant with his substance-abuse treatment; and (iv) had not signed up for parenting classes. The Children were doing well in foster care, although G.G. was struggling somewhat in school. A 504-plan meeting had been scheduled for September. Although DSCYF had advised

Father of A.G.'s kindergarten graduation and offered to transport him to the ceremony, Father did not attend. The Family Court found that it remained in the Children's best interests for them to remain in DSCYF custody.

(8) On October 19, 2022, the Family Court held a nine-month review hearing. Father had undergone a psychological evaluation and had been diagnosed with Opiate and Methamphetamine Substance Use Disorder by Dr. Patrick Zingaro. Dr. Zingaro testified that Father's diagnosis affects his ability to care for the Children. Dr. Zingaro recommended that Father receive individual therapy and undergo a psychiatric evaluation and an anger-management evaluation. Father tested positive for methadone on August 11, 2022. After the treatment provider decided to supervise Father's urine screens, Father asked to be discharged from the program. Father then angrily left the office and spun his tires in the parking lot. The Children continued to do well in foster care. Maternal Grandmother testified that the Children had witnessed a lot of domestic violence between Father and Mother. She opined that the Children were safer with the foster family and that Paternal Grandfather enables Father. The Family Court found that the Children were dependent in Father's care and that it was in their best interests for them to remain in DSCYF custody.

(9) The Family Court held a permanency hearing over two days in December 2022. As of the permanency hearing, Father had (i) revoked his consent

to share his substance-abuse treatment records with DSCYF, (ii) admitted to submitting someone else's urine instead of his own for testing, (iii) failed to follow up with Dr. Zingaro's treatment recommendations, (iv) cancelled several visits with his family interventionist, (v) was only attending half of his scheduled visits with the Children, (vi) was on probation for driving under the influence ("DUI"), (vii) had not yet taken domestic violence classes, (viii) had not provided DSCYF with proof of his income, and (ix) had not attended any of the Children's medical appointments. Because Father appeared to be under the influence of drugs or alcohol during the second day of the permanency hearing, the Family Court ordered Father to submit to a supervised drug test after the hearing. At the conclusion of the hearing, the Family Court changed the permanency plan to the concurrent goals of reunification and termination of parental rights for purposes of adoption.

(10)    At the March 31, 2023 termination-of-parental-rights ("TPR") hearing, the Family Court heard testimony from Lieutenant Susan Kline, two family interventionists, the Children's foster care and adoption worker, Father's treatment worker, the treatment worker's supervisor, the permanency worker's supervisor, Paternal Grandfather, Father, Mother, the Children's foster mother, and the Children's court appointed special advocate. The evidence presented fairly established that Father and Mother had a history of domestic violence, with the police responding to several incidents at Paternal Grandfather's home, including one

7

involving Father and Mother immediately after the permanency hearing on December 27, 2022, and one involving Paternal Grandfather and Father in early 2023.

(11) Father's treatment worker testified that although Father was initially not engaged with DSCYF, he had attempted to complete elements of his case plan. Three days before the TPR hearing, Father met with his treatment worker's supervisor, Amanda Niblet-Boggs. Father provided Niblet-Boggs with proof that he had completed parenting classes as of January 4, 2023. Father also gave Niblet-Boggs a letter from Dover Comprehensive Treatment Center ("Dover Comprehensive") stating that Father had enrolled in substance-abuse treatment in February 2023 as well as proof of what he claimed were clean urine screens from November 2022 through January 2023.[4] Because Father had not signed a release with Dover Comprehensive, however, DSCYF could not confirm that Father was, in fact, enrolled in treatment there. Notably, Father had not submitted to a drug test as ordered by the court following the permanency hearing. Nor had Father completed domestic violence classes, complied with the conditions of the DUI first-offender program, followed up with Dr. Zingaro's treatment recommendations, or provided tax verification of his self-employment. And Father had only recently moved out of

---

[4] Two of the test results were odd: one was positive, but Father alleged (without proof) that it was a false positive; and one was negative for Suboxone, which Father had been prescribed and was presumably taking.

Paternal Grandfather's home. Finally, the evidence established that the Children were thriving in their foster home and had bonded with their foster parents, who are adoptive resources.

(12) On May 1, 2023, the Family Court issued a written order terminating the parental rights of Father in the Children. The Family Court first found that DSCYF had proved by clear and convincing evidence that Father had failed to plan adequately for the Children's care under 13 *Del. C.* § 1103(a)(5) by failing to satisfy the substance-abuse-treatment, mental-health-treatment, and domestic-violence components of his case plan. When the statutory basis for termination is failure to plan, there must be proof of at least one additional statutory factor.[5] Here, the Family Court found proof that the Children had been in DSCYF care for a period in excess of one year.[6] Turning to the best-interests factors as defined by 13 *Del. C.* § 722, the Family Court found that five factors favored termination of Father's rights (the Children's interactions with their parents and other significant people in their lives; the Children's adjustment to their home, school, and community; Father's past and present compliance with his parental responsibilities to the Children; Father's domestic violence history; and Father's criminal history). The court then found by

---

[5] 13 *Del. C.* § 1103(a)(5)(a)(1)-(5) (listing additional conditions).

[6] *Id.* § 1103(a)(5)(a)(1).

clear and convincing evidence that termination of Father's parental rights was in the Children's best interests. This appeal followed.

(13) On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[7] We review legal rulings *de novo*.[8] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly erroneous.[9] If the Family Court has correctly applied the law, then our standard of review is abuse of discretion.[10] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[11]

(14) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[12] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[13] When the statutory basis for termination is failure to plan, the Family Court must also find proof of at least one additional statutory condition[14] and proof that DSCYF

[7] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).

[8] *Id.* at 440.

[9] *Id.*

[10] *Id.*

[11] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).

[12] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

[13] *Id.* at 537.

[14] 13 *Del. C.* § 1103(a)(5)(a)(1)-(5) (listing additional conditions).

made *bona fide* reasonable efforts to preserve the family unit.[15]  If the Family Court finds a statutory basis for termination of parental rights, the court must determine whether, under 13 *Del. C.* § 722, severing parental rights is in the best interests of the child.[16]  Both of these requirements must be established by clear and convincing evidence.[17]

(15)  On appeal, Father argues: (i) the Family Court judge should have recused herself because she attended Niblet-Boggs' wedding; (ii) his treatment worker was unprofessional; (iii) he satisfied the substance-abuse-treatment component of his case plan because he provided DSCYF with clean drug screens and did not test positive while he was in weekly counseling; (iv) he satisfied the parenting-class component of his case plan; (v) he has video to prove that his visits with the Children were productive; and (vi) he satisfied the housing component of his case plan because Mother is not living at Paternal Grandfather's home.  Father's claims are unavailing.

(16)  As a preliminary matter, to the extent that Father wants to supplement the record with evidence not introduced below—specifically, that he has satisfied the housing component of his case plan because Mother is no longer living at

---

[15] *In re Hanks*, 553 A.2d 1171, 1179 (Del. 1989).

[16] *Shepherd*, 752 A.2d at 536-37.

[17] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731 (Del. 2008).

Paternal Grandfather's house—he cannot.[18]  And Father's arguments concerning the parenting component of his case plan would not change the outcome here—the Family Court found that Father had substantially completed this portion of his case plan based on his completion of parenting classes and his active participation in his visits with the Children.   Next, we have carefully considered Father's claim that he satisfied the substance-abuse-treatment component of his case plan and conclude that the record supports the Family Court's conclusion that he did not.   At a minimum, Father does not allege that he *ever* submitted to a supervised drug screen—even after he acknowledged submitting false samples for testing *and* being court-ordered to do so.

(17)   Turning to Father's claim that his treatment worker was unprofessional because she invited him to eat dinner with her on one occasion, the record reflects that Father was advised of the procedure to follow if he sought the assignment of a different treatment worker to his case.  He did not seek reassignment.  In any event, Father does not maintain, and the record does not reflect, that this isolated incident affected in any way DSCYF's *bona fide* reasonable efforts to reunify Father with the Children.

---

[18] *See Del. Elec. Coop., Inc. v. Duphily*, 703 A.2d 1202, 1206 (Del. 1997) ("It is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by a trial court.").

(18) Finally, there is no merit to Father's argument that the Family Court judge should have recused herself. The TPR transcript[19] reflects that the Family Court judge advised the parties that Niblet-Boggs was her husband's godchild and that she had presided over Niblet-Boggs' wedding. The Family Court judge then took a brief recess to give the parties time to discuss whether they thought her relationship with Niblet-Boggs created a problem. Because the parties did not raise any such objection, we review Father's claim for plain error.[20] We find no plain error here. Indeed, to the extent that Father claims that the Family Court judge unduly credited Niblet-Boggs' testimony, we note that Niblet-Boggs' testimony was largely favorable to Father: she testified that Father had satisfied the parenting-class component of his case plan and that he had re-engaged with substance-abuse treatment in the weeks before the TPR hearing.

(19) Having carefully reviewed the parties' positions and the record on appeal, we find that the Family Court's factual findings are supported by the record, and we can discern no error in the court's application of the law to the facts. We therefore conclude that Father's appeal is wholly without merit and devoid of any arguably appealable issues. And we are satisfied that Father's counsel made a

---

[19] Niblet-Boggs did not testify at any of the earlier proceedings.

[20] Del. Supr. Ct. R. 8.

conscientious effort to examine the record and the law and properly determined that Father could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court be AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice